James WHITE, Plaintiff–Appellant,

v.

Hezikiah WALKER, and Town of Verona, MS, Defendants–Appellees.

No. 90–1559.

United States Court of Appeals,
Fifth Circuit.

June 11, 1991.

Jim Waide, Tupelo, Miss., James S. Gore, Houston, Miss., for plaintiff-appellant.

Guy W. Mitchell, III, Donna M. Barnes, John Hill, Mitchell, McNutt, Bush, Lagrone, & Sams, Tupelo, Miss., for Walker.

Gary L. Carnathan, Carnathan & Malski, Tupelo, Miss., for Town of Verona.

Before RUBIN, POLITZ, and DUHÉ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A police officer stopped a fourteen-year-old driving his parents' car without a license and asked the young man to follow him to the police station. At the station, the officer told the two young women that had been riding in the car that the young man would be a bad influence on them, and he confiscated the young man's keys "for grand auto theft." The young man went home soon thereafter. He committed suicide less than an hour later. The young man's father brought various constitutional and state-law tort claims against both the officer and the town that employed him. The district court granted partial summary judgment for the defendants as to one claim and granted a directed verdict in favor of the defendants on the remainder. We reverse the district court's grant of qualified immunity to the officer, but affirm in all other respects.

I

Because this case was disposed of on a directed verdict, we consider all the evidence and draw all reasonable inferences therefrom in favor of the plaintiff.[1] The facts established by the trial record are these:

On November 23, 1984, fourteen-year-old Mark White, without permission, took his parents' car for a drive around the small Mississippi town of Verona. Along the way, he picked up his girlfriend, Christy Armstrong, and his friends Steve Hill and Tracy Grubbs. As they headed up Highway 45, a police cruiser driven by Officer Hezikiah Walker pulled onto the road behind them. Nervous, Mark decided to try to circle back. He attempted a left turn at the next intersection, but oncoming traffic blocked the intersection; the light turned red while he was under it. Rather than

---

1. *E.g., Treadaway v. Societe Anonyme Louis–*     *Dreyfus,* 894 F.2d 161, 164 (5th Cir.1990).

proceed with his turn, Mark switched off his turn signal and went straight through the intersection. Officer Walker turned on his vehicle's flashing lights, signalling Mark to stop.

After stopping, Mark got out of the car to meet Officer Walker. Steve Hill heard Mark tell Officer Walker that he had a driver's license but had left it at home. Mark got back in the car a moment later, and told his friends that they were going to follow the officer back to the police station. Once there, Mark went into the station with the officer. Mark reemerged a few moments later and asked Steve Hill if he knew anyone with a driver's license that Mark could call; Steve gave Mark the name of a friend who proved to be unavailable. Mark came back out and told his friends to lock the car and come in the station. When Christy and Tracy entered the station, Officer Walker told them that they "shouldn't be hanging around boys like [Mark and Steve] because they would get [the girls] in trouble" and were a "bad influence." The officer then asked Mark for the keys to the car, and when Mark asked why he wanted them the officer said, "For grand auto theft." Instead of charging Mark with auto theft, however, the officer simply issued him a ticket for driving without a license.

Mark and Steve went to wait in the station's break room while Officer Walker drove Christy and Tracy home. Steve had called his brother, who said he'd pick Steve up. Mark told Steve that he was going to have to put on several pairs of sweat pants to protect himself from the spanking he was going to get, and that he was afraid that Christy's father would not let him see Christy anymore. He then said, "Man, I ought to kill myself." Steve asked him if he was serious, but Mark said he was only kidding. Steve's brother arrived a few minutes later, and took the boys home. Mark committed suicide within the hour.

Mark's father, James White, filed suit against Officer Walker and the town of Verona, Mississippi under 42 U.S.C. § 1983, alleging that Officer Walker had violated Mark's rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and under Mississippi law by intentionally inflicting emotional distress and violating the Mississippi Youth Court Law.[2] The district court granted summary judgment against White on the claim that Officer Walker had violated the Youth Court Law. The district court bifurcated the trial on the remaining issues in a rather unusual manner: In Phase I, as the court called it, White was limited to presenting evidence "on the liability of defendant Walker," and was specifically precluded from presenting evidence on causation, damages, or the liability of the Town of Verona. Such evidence would be allowed in Phase II, but only if White survived a motion for directed verdict after Phase I. The case was tried in accordance with the order.

The trial never reached Phase II. The district court directed a verdict against White on his remaining claims after the close of White's Phase I case and before Walker or the Town of Verona had presented any evidence. White argues that the district court erred in (1) holding that Officer Walker was entitled to qualified immunity, and therefore directing a verdict on White's § 1983 claim; (2) directing a verdict on his claim for intentional infliction of emotional distress; (3) granting summary judgment on his claim that Officer Walker had violated the Mississippi Youth Court Law; (4) excluding the deposition testimony of Verona Deputy Police Chief Bill Yant; and (5) excluding the expert testimony of a child psychologist on the issue of causation.

## II

■ Officer Walker moved for summary judgment on the ground that he was entitled to qualified immunity. The district court denied that motion, finding that the summary judgment evidence revealed material issues of fact. Officer Walker has never appealed that ruling. A directed verdict in favor of Officer Walker on the

---

**2.** Miss.Code Ann. §§ 43–21–101 et seq. (1990).

ground of qualified immunity was therefore appropriate only if the evidence introduced at trial would compel a reasonable jury to find that Officer Walker reasonably could have believed that his stop of Mark's vehicle and his seizure of Mark's person were lawful, in light of clearly established law and the information Officer Walker possessed at the time.[3]

■ Nothing in the record supports the district court's holding that Officer Walker was entitled to qualified immunity as a matter of law. "Qualified or 'good faith immunity' is an affirmative defense that must be pleaded [and proved] by a defendant official."[4] Officer Walker never testified, nor did he introduce any other evidence to prove, that he reasonably believed that his stop of Mark's vehicle and his seizure of Mark's person were reasonable under the Fourth Amendment. The district court believed that Steve Hill's testimony concerning Mark's aborted left turn was sufficient to establish a reasonable suspicion of wrongdoing, which is all the Fourth Amendment requires for a traffic stop.[5] That may be so. But there is no evidence that Officer Walker stopped Mark's vehicle because of the aborted left turn: For all the record reveals, Officer Walker might have stopped the car on a whim. Similarly, there is no evidence that Officer Walker reasonably believed that his subsequent seizure of Mark's person was lawful: Nothing in the record indicates that Officer Walker knew that Mark was in fact unlicensed and underage at the time of the seizure, or that Officer Walker reasonably could have believed that the seizure was otherwise justified.

Accordingly, we must reverse the district court's directed verdict.

White urges us to rule on whether Officer Walker's actions violated the Fourth Amendment. Given the state of the record and the fact that the district court did not rule on the issue, we decline to do so.

## III

### A. *Infliction of Emotional Distress*

■ White next argues that the district court erred in granting a directed verdict against him on his claim that Officer Walker intentionally inflicted emotional distress on Mark by telling Christy and Tracy that they should stop hanging around with him and by telling Mark that his keys were being impounded "for grand auto theft." A directed verdict is justified when, after considering all of the evidence and drawing all inferences therefrom in favor of the nonmoving party, the court is convinced that no reasonable jury could find in favor of the nonmovant.[6]

■ Under Mississippi law,

[w]here there is something about the defendant's conduct which *evokes outrage or revulsion,* done intentionally—or even unintentionally yet the results being reasonably foreseeable—Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. In such instances, it is the *nature of the act* itself—as opposed to the seriousness of the consequences— which gives impetus to legal redress.[7]

As this court noted in *Green v. Amerada Hess Corporation,* [8] the contours of this "outrage or revulsion" standard are not clearly defined in the Mississippi case law. Comment d to the Restatement (Second) of Torts § 46, whose predecessor in the Restatement (First) was cited with approval by the Mississippi Supreme Court in *Lyons*

---

**3.** *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Bigford v. Taylor,* 896 F.2d 972, 974 (5th Cir.1990).

**4.** *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).

**5.** *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979).

**6.** *Gay v. Barge 266,* 915 F.2d 1007, 1011 (5th Cir.1990).

**7.** *Sears, Roebuck & Co. v. Devers,* 405 So.2d 898, 902 (Miss.1981) (emphasis added).

**8.** 707 F.2d 201, 209 (5th Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 701, 79 L.Ed.2d 166 (1984).

*v. Zale Jewelry Company,* [9] elaborates on its analogous requirement that a defendant's conduct be "extreme and outrageous" as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

We do not believe that a reasonable jury could conclude that Officer Walker's statements to Mark were so outrageous or revulsive as to warrant imposing liability. His remarks may have been uncalled for, and they were probably ill-advised. But they were not so outrageous as to be "utterly intolerable in a civilized community." Mark had violated the law, and had subjected himself, his friends, and the motorists and pedestrians of Verona to a risk of grave bodily injury by doing so. Impressing Mark with the gravity of his offense was a legitimate police function, even though Officer Walker may not have used the most desirable means. The record indicates that Mark was never handcuffed, he was never jailed nor threatened with jail, he was never subjected to custodial interrogation, he was never threatened with physical injury—indeed, he was never even formally arrested. A reasonable jury could not find Officer Walker liable for the intentional infliction of emotional distress.

None of the cases cited by White persuades us otherwise. The conduct alleged in *Lyons v. Zale Jewelry Company* [10] was markedly more egregious. The Mississippi Supreme Court in that case reversed a demurrer to the plaintiff's complaint, which alleged that a collection agent had used abusive and vulgar language, had denigrated her abilities as a mother, had threatened civil action, and had threatened to have her jailed, all in an effort to collect her adult *son's* debt. *Saenger Theatres Corporation v. Herndon,* [11] decided in 1938, and *Continental Casualty Company v. Garrett,* [12] decided in 1935, judged the outrageousness of the conduct at issue by standards now more than a half-century out of date. We doubt that a contemporary court would impose liability for those actions. In any event, *Herndon* and *Garrett* are distinguishable: both involved outright and malicious slander of a sort not present here. The directed verdict was properly granted.

### B. *Violation of Youth Court Law*

■ White next argues that the district court erred in granting summary judgment on his claim that Walker violated the Mississippi Youth Court Law by taking Mark into custody without an order from the Youth Court. White claims that the Youth Court Law establishes a statutory standard of care, the violation of which is negligence per se, and that Walker's negligence in this respect was a proximate cause of Mark's death.

The Mississippi Youth Court Law provides that "no child in a matter in which the youth court has *exclusive original jurisdiction* shall be taken into custody by a law enforcement officer ... unless the judge or his designee has issued a custody order to take the child into custody." [13] The district court concluded that the Youth Court Law's prohibition against taking minors into custody does not apply to minors charged with traffic offenses, for under § 43–21–159(1) the Youth Court does not have "exclusive original jurisdiction" over traffic offenses. We agree. Section 43–

---

**9.** 246 Miss. 139, 150 So.2d 154, 158 (1963).

**10.** Id.

**11.** 180 Miss. 791, 178 So. 86 (1938).

**12.** 173 Miss. 676, 161 So. 753 (1935).

**13.** Miss.Code Ann. § 43–21–301(2) (1981 & Supp.1990) (emphasis added); *see* id. § 43–21–303(1).

21–151(1) grants the Youth Court "exclusive original jurisdiction in all proceedings concerning a delinquent child." Section 43–21–159(1), however, creates an exception, granting concurrent jurisdiction to the "appropriate criminal court" in "cases where the child is charged with a hunting or fishing violation *or a traffic violation.*" [14] The evidence on summary judgment is undisputed that, if Mark was taken into "custody" at all, it was for a traffic violation. He was, therefore, not taken into custody "in a matter in which the youth court has exclusive original jurisdiction."

White argues that this interpretation makes no sense because it would give minors who are accused murderers, drug dealers, and thieves greater protection than children accused of mere traffic violations. That, it seems to us, is perfectly logical: the accused traffic violator is unlikely to be subjected to a violent arrest, incarceration, prolonged interrogation, or the other necessary evils attendant to apprehending, trying, and punishing dangerous criminals. Traffic violators accordingly have little need for the protections offered other juvenile offenders by sections 43–21–301 and 43–21–309. The summary judgment was properly granted.

## IV

■ White's next contention is that the district court erred in excluding the deposition testimony of Verona's Deputy Chief of Police Bill Yant, who was killed in the line of duty before trial. We disagree. Officer Yant was tendered as a lay witness. Under Federal Rule of Evidence 701, lay opinion is admissible only if "rationally based on the perception of the witness." White propounded to Officer Yant a series of hypothetical questions, not one of which called for an answer "rationally based on the perception of the witness." Indeed, many of White's questions to Officer Yant sought expert opinions on child psychology that are so clearly and obviously beyond the pale of lay opinion testimony as to

render their proffer frivolous. The testimony was properly excluded.

■ White also argues that the district court erred in anticipatorily excluding the expert testimony of psychologist Dr. James Lane, whom White would have called in Phase II of the trial had his case survived Officer Walker's motion for a directed verdict. Dr. Lane would have testified that Officer Walker's statements to Mark were a cause of Mark's suicide. The district court ruled that, had Dr. Lane been called, his testimony would have been excluded on the ground that the reliability and foundation of Dr. Lane's opinion was highly questionable.

The only issues that will remain in this case on remand are (1) whether Officer Walker is entitled to qualified immunity; and (2) if not, whether Officer Walker violated the Fourth Amendment by stopping Mark's vehicle or by seizing Mark's person. Dr. Lane testified in his proffer only that Officer Walker's *statements* contributed to Mark's suicide—but we have already determined that Officer Walker's statements were not tortious conduct. Dr. Lane did *not* testify that the seizures of Mark's vehicle and Mark's person, in and of themselves, were contributing factors to Mark's suicide. Dr. Lane's testimony, at least in the form offered, is therefore irrelevant to a determination of the issues in this case. Accordingly, whether the district court properly excluded his testimony at trial is a moot issue.

## V

White insisted at oral argument that we should remand to allow him to present his proof against the Town of Verona. White's brief on appeal, however, raised no issue with respect to the Town, nor does the record reveal that White objected below on the ground that the district court's unusual bifurcation order unfairly deprived him of an opportunity to make his case against the Town. The law in this circuit is well established: Issues not raised in a

---

**14.** Id. § 43–21–159(1) (emphasis added).

party's brief are waived.[15] The issue of the Town's liability, therefore, is not before us.

The judgment of the district court granting Officer Walker qualified immunity is REVERSED and the cause is REMANDED for proceedings consistent with this opinion. The judgment is in all other respects AFFIRMED.

---

**15.** *E.g., Nissho–Iwai Co., Ltd. v. Occidental Crude Sales,* 729 F.2d 1530, 1539 n. 14 (5th Cir.1984).