James WHITE, Plaintiff–Appellant,

v.

Hezikiah WALKER, X Bonding Company, and Town of Verona, Mississippi, Defendants–Appellees.

No. 90–1559.

United States Court of Appeals,
Fifth Circuit.

Dec. 30, 1991.

Jim Waide, Tupelo, Miss., James S. Gore, Houston, Miss., for plaintiff-appellant.

Guy W. Mitchell, III, John Hill, Donna M. Barnes, Mitchell, McNutt, Bush, Lagrone, & Sams, Tupelo, Miss., for Walker.

Gary L. Carnathan, Carnathan & Malski, Tupelo, Miss., for Town of Verona.

## OPINION ON REHEARING

Before POLITZ, and DUHÉ, Circuit Judges.[*]

**PER CURIAM:**

We withdraw the prior opinion of this panel appearing at 932 F.2d 1136 and substitute therefor the following.

A police officer stopped a fourteen year old driving his parents' car without a license and asked the young man to follow him to the police station. At the station, the officer told the two young women who had been riding in the car that the young man would be a bad influence on them, and he confiscated the young man's keys "for grand auto theft." The young man went home soon thereafter. He committed suicide less than an hour later. The young man's father brought various constitutional and state-law tort claims against both the officer and the town that employed him. The district court granted partial summary judgment for the defendants as to one claim and granted a directed verdict in favor of the defendants on the remainder. We reverse the district court's grant of qualified immunity to the officer, but affirm in all other respects.

I

Because the qualified immunity issue was disposed of on a directed verdict, we must consider all the evidence and draw all reasonable inferences therefrom in the light most favorable to the plaintiff.[1] We therefore use this approach in summarizing the evidence.

On November 23, 1984, fourteen-year-old Mark White, without permission, took his parents' car for a drive around the small Mississippi town of Verona. Along the way, he picked up his girlfriend, Christy Armstrong, and his friends Steve Hill and Tracy Grubbs. As they headed up Highway 45, a police cruiser driven by Officer Hezikiah Walker pulled onto the road behind them. Nervous, Mark decided to try to circle back. He attempted a left turn at the next intersection, but oncoming traffic blocked the intersection; the light turned red while he was under it. Rather than proceed with his turn, Mark switched off his turn signal and went straight through the intersection. Walker turned on his vehicle's flashing lights, signaling Mark to stop.

After stopping, Mark got out of the car to meet the officer. Steve heard Mark tell the officer that he had a driver's license

---

[*] Pending rehearing Judge Alvin B. Rubin died. Therefore, this matter has been decided on rehearing by a quorum. (28 U.S.C. § 46(d)).

1. *See Treadaway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161, 164 (5th Cir.1990).

but had left it at home. Mark got back in the car a moment later and told his friends that they were going to follow the officer back to the police station.

Once there, Mark went into the station with the officer. Mark reemerged a few moments later and asked Steve if he knew anyone with a driver's license that they could call; Steve gave Mark the name of a friend who proved to be unavailable. Mark came back out and told his friends to lock the car and come in the station.

When Christy and Tracy entered the station, Walker told them that they "shouldn't be hanging around boys like [Mark and Steve] because they would get [the girls] in trouble" and were a "bad influence." The officer then asked Mark for the keys to the car, and when Mark asked why he wanted them, the officer said, "For grand auto theft." Instead of charging Mark with auto theft, however, the officer simply issued him a ticket for driving without a license.

Mark and Steve went to wait in the station's break room while Walker drove the girls home. Steve had called his brother, who agreed to pick Steve up. Mark told Steve that he was going to have to put on several pairs of sweat pants to protect himself from the spanking he was going to get and that he was afraid that Christy's father would not let him see Christy anymore.

Mark then said, "Man, I ought to kill myself." Steve asked him if he was serious, but Mark said that he was only kidding. Steve's brother arrived a few minutes later and took the boys home. Mark committed suicide within the hour.

Mark's father, James White, filed suit against Walker and the Town of Verona under 42 U.S.C. § 1983, alleging that Walker had violated Mark's rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. He also alleged two state-law claims for intentional infliction of emotional distress and violation of the Mississippi Youth Court Law.[2]

The district court granted summary judgment against White on the claim that Walker had violated the Youth Court Law. The district court bifurcated the trial on the remaining issues in a rather unusual manner: In Phase I, as the court called it, White was limited to presenting evidence "on the liability of defendant Walker" and was specifically precluded from presenting evidence on causation, damages, or the liability of the Town of Verona. Such evidence would be allowed in Phase II, but only if White survived a motion for directed verdict after Phase I. The case was tried in accordance with the order.

The trial never reached Phase II. The district court directed a verdict against White on his remaining claims at the close of White's Phase I case. Neither Walker nor the Town of Verona had presented any evidence. White argues that the district court erred in (1) holding that Walker was entitled to qualified immunity, and therefore directing a verdict on White's § 1983 claim; (2) directing a verdict on his claim for intentional infliction of emotional distress; (3) granting summary judgment on his claim that Walker had violated the Mississippi Youth Court Law; (4) excluding the deposition testimony of Verona Deputy Police Chief Bill Yant; and (5) excluding the expert testimony of a child psychologist on the issue of causation.

## II

■ Police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[3] The question is not whether the law was settled, viewed abstractly, but whether, measured by an objective standard, a reasonable officer would know that his conduct is illegal.[4] The certainty of the law

---

2. Miss.Code Ann. §§ 43–21–101 et seq. (1972 & Supp.1991).

3. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

4. *Matherne v. Wilson,* 851 F.2d 752, 756 (5th Cir.1988).

must be measured against an objectively reasonable view of the facts facing an official.[5]

■ The entitlement to qualified immunity may be established as a matter of law by the district court.[6] But if there are triable issues of fact about whether an officer could reasonably believe that his conduct was legal, then a jury should evaluate the question.[7]

■ A directed verdict in favor of Walker on the ground of qualified immunity was therefore appropriate only if the evidence introduced at trial would compel any reasonable jury to find that Walker reasonably could have believed that his stop of Mark's vehicle and his seizure of Mark's person were lawful, in light of clearly established law and the information Walker possessed at the time.[8]

Viewing the evidence and all reasonable inferences in the light most favorable to White, we conclude that the district court erred in granting a directed verdict for Walker. The record reveals that Christy Armstrong, who was riding in the front seat of the car, testified that Mark had done nothing wrong at the time Walker stopped the car. A jury could believe the testimony of Christy Armstrong and could reasonably infer that she was familiar with traffic regulations.

More specifically, Steve Hill testified that when Mark entered the intersection, the light was green. Mississippi law provides the following rule for traffic approaching an intersection when the light is green:

Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. However, vehicular traffic shall yield the right-of-way to oth-

er vehicles and to pedestrians *lawfully within the intersection* at the time such signal is exhibited.[9]

If the light changes to yellow as a car approaches the intersection, the following rule is applicable:

Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at the intersection, but *if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection.*[10]

Viewing the facts in the light most favorable to White, then, and applying the law to those facts, a jury could have reasonably determined that Walker had no reasonable basis for believing that stopping the car was lawful under settled law. If the light was green when Mark entered the intersection and if no other oncoming vehicles were yet in the intersection, then under Mississippi law Mark could proceed into the intersection to make a turn. If the light then turned yellow while Mark was in the intersection, Mississippi law allowed him to drive cautiously through the intersection. Viewed in the light most favorable to White, the facts support the conclusion that Mark followed the law precisely and that Walker had no objectively reasonable basis for stopping him.

Similarly, there is no evidence on which to base a finding that Walker could have reasonably believed that his subsequent seizure of Mark's person was lawful. Nothing in the record indicates that Walker had discovered that Mark was in fact unlicensed and underage at the time of the seizure. The court could not conclude, therefore, that a reasonable officer could have believed that the seizure was justified on that basis. In addition, no other facts in

5. *Anderson v. Creighton,* 483 U.S. 635, 642, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).

6. *See Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *Harlow,* 457 U.S. at 817–19, 102 S.Ct. at 2737–38; *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990).

7. *See Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988); *see also Rakovich v. Wade,* 850 F.2d

1180, 1201 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

8. *Anderson,* 483 U.S. at 642, 107 S.Ct. at 3040; *Bigford v. Taylor,* 896 F.2d 972, 974 (5th Cir. 1990).

9. Miss.Code Ann. § 63-3-309(1) (1972) (emphasis added).

10. *Id.* § 63-3-309(2) (emphasis added).

the record provide a basis on which a reasonable officer could have concluded that the seizure was justified.

We recognize that qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law."[11] But the defense in this case has not yet presented its version of the facts. Walker's testimony is not necessary to establish the reasonableness of his conduct, because the applicable standard is objective, not subjective.

Walker or another defense witness may explain that an oncoming vehicle was lawfully within the intersection when Mark entered it. This fact alone would give a reasonable officer sufficient reason to stop the car, for it would indicate that Mark, who intended to turn left, proceeded into the intersection unlawfully under Mississippi law. Similarly, Walker or another witness may testify that the light was yellow, not green, when Mark entered the intersection. This fact, too, would give a reasonable officer a valid reason to stop the car.

The defense may present another officer to testify that in observing possible infractions of intersection traffic laws, officers must react in a split second to circumstances that are not always clear. That witness may testify that even highly competent officers may occasionally stop drivers who actually did not violate any law. Certainly, all ticketed drivers who successfully contest their tickets in traffic court do not have valid civil claims against the ticketing officers.

In the same way, an officer testifying for the defense may explain that through radio communications to headquarters and through computers, any officer has immediate access to information about whether a driver has a valid license. Or Walker may testify that before seizing Mark, he had, in fact, learned that Mark was underaged and unlicensed. Such facts would provide a basis on which a reasonable officer could have believed that his seizure of Mark was lawful.

Only when all the facts have been determined by the jury can a decision be reached on whether Walker is entitled to qualified immunity. Realistically, Walker's actions will probably fit easily within the broad protective net of qualified immunity. But neither we nor trial-court judges are factfinders in jury trials. And granting a directed verdict under these circumstances deprived White of the right to have the jury decide exactly what occurred during the incident in question. "When disputed facts material to the qualified immunity issue exist and reasonable jurors could reach differing conclusions regarding those facts, it is inappropriate for the district court to grant a directed verdict based on qualified immunity."[12] Accordingly, we reverse the directed verdict based on qualified immunity.

White urges us to rule on whether Walker's actions violated the Fourth Amendment. Given the state of the record and the fact that the district court did not rule on this issue, we decline to do so.

### III

#### A. *Infliction of Emotional Distress*

White next argues that the district court erred in granting a directed verdict against him on his claim that Walker intentionally inflicted emotional distress on Mark by telling Christy and Tracy that they should stop hanging around with the boys and by telling Mark that his keys were being impounded "for grand auto theft." A directed verdict is justified when, after considering all of the evidence and drawing all inferences therefrom in favor of the nonmoving party, the court is convinced that no reasonable jury could find in favor of the nonmovant.[13]

Under Mississippi law,

[w]here there is something about the defendant's conduct which *evokes outrage*

---

11. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

12. *Brisk v. City of Miami Beach,* 726 F.Supp. 1305, 1313 (S.D.Fla.1989).

13. *Gay v. Barge 266,* 915 F.2d 1007, 1011 (5th Cir.1990).

*or revulsion,* done intentionally—or even unintentionally yet the results being reasonably foreseeable—Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. In such instances, it is the *nature of the act* itself—as opposed to the seriousness of the consequences—which give impetus to legal redress.[14]

As this Court noted in *Green v. Amerada Hess Corporation,*[15] the contours of this "outrage or revulsion" standard are not clearly defined in the Mississippi case law. Comment *d* to section 46 of the Restatement (Second) of Torts, whose predecessor in the Restatement (First) was cited with approval by the Mississippi Supreme Court in *Lyons v. Zale Jewelry Company,*[16] elaborates on its analogous requirement that a defendant's conduct be "extreme and outrageous" as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

We do not believe that a reasonable jury could conclude that the officer's statements to Mark were so outrageous or revulsive as to warrant imposing liability. His remarks may have been uncalled for, and they were probably ill-advised. But they were not so outrageous as to be "utterly intolerable in a civilized community."

By driving unlicensed Mark had violated the law and had subjected himself, his friends, and the motorists and pedestrians of Verona to a risk of grave bodily injury. Impressing Mark with the gravity of his offense was a legitimate police function, even though Walker may not have used the most desirable means. The record indicates that Mark was never handcuffed, he was never jailed nor threatened with jail, he was never subjected to custodial interrogation, he was never threatened with physical injury—indeed, he was never even formally arrested. A reasonable jury could not find Walker liable for the intentional infliction of emotional distress.

None of the cases cited by White persuades us otherwise. The conduct alleged in *Lyons v. Zale Jewelry Company*[17] was markedly more egregious. The Mississippi Supreme Court in that case reversed a demurrer to the plaintiff's complaint, which alleged that a collection agent had used abusive and vulgar language, had denigrated her abilities as a mother, had threatened civil action, and had threatened to have her jailed—all in an effort to collect her adult *son's* debt.

*Saenger Theatres Corporation v. Herndon,*[18] decided in 1938, and *Continental Casualty Company v. Garrett,*[19] decided in 1935, judged the outrageousness of the conduct at issue by standards now more than a half-century out of date. We doubt that a contemporary court would impose liability for those actions. In any event, *Herndon* and *Garrett* are distinguishable: both involved outright and malicious slander of a sort not present here. The directed verdict was properly granted.

### B. *Violation of the Mississippi Youth Court Law*

■ White next argues that the district court erred in granting summary judgment on his claim that Walker violated the Mis-

---

**14.** *Sears, Roebuck & Co. v. Devers,* 405 So.2d 898, 902 (Miss.1981) (emphasis added).

**15.** 707 F.2d 201, 209 (5th Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 701, 79 L.Ed.2d 166 (1984).

**16.** 150 So.2d 154, 158 (Miss.1963).

**17.** *Id.*

**18.** 180 Miss. 791, 178 So. 86 (1938).

**19.** 161 So. 753 (Miss.1935).

sissippi Youth Court Law by taking Mark into custody without an order from the youth court. White claims that this law establishes a statutory standard of care, the violation of which is negligence per se, and that Walker's negligence in this respect was a proximate cause of Mark's death.

The Mississippi Youth Court Law provides that "no child in a matter in which the youth court has *exclusive original jurisdiction* shall be taken into custody by a law enforcement officer ... unless the judge or his designee has issued a custody order to take the child into custody." [20] The district court concluded that the law's prohibition against taking minors into custody does not apply to minors charged with traffic offenses, for under section 43–21–159(1) the youth court does not have "exclusive original jurisdiction" over traffic offenses. We agree.

Section 43–21–151(1) grants the youth court "exclusive original jurisdiction in all proceedings concerning a delinquent child." Section 43–21–159(1), however, creates an exception, granting concurrent jurisdiction to the "appropriate criminal court" in "cases where the child is charged with a hunting or fishing violation *or a traffic violation*." [21] The evidence on summary judgment is undisputed that, if Mark was taken into "custody" at all, it was for a traffic violation. He was, therefore, not taken into custody "in a matter in which the youth court has exclusive original jurisdiction."

White argues that this interpretation makes no sense because it would give minors who are accused murderers, drug dealers, and thieves greater protection than children accused of mere traffic violations. That, it seems to us, is perfectly logical: the accused traffic violator is unlikely to be subjected to a violent arrest, incarceration, prolonged interrogation, or the other necessary evils attendant to apprehending, trying, and punishing dangerous criminals. Traffic violators accordingly have little need for the protections offered other juvenile offenders by sections 43–21–301 and 43–21–309. The summary judgment was properly granted.

### IV

■ White's next contention is that the district court erred in excluding the deposition testimony of Verona's Deputy Chief of Police Bill Yant, who was killed in the line of duty before trial. We disagree. Officer Yant was tendered as a lay witness. Under Federal Rule of Evidence 701, lay opinion is admissible only if "rationally based on the perception of the witness." White propounded to Officer Yant a series of hypothetical questions, not one of which called for an answer "rationally based on the perception of the witness." Indeed, many of White's questions to Officer Yant sought expert opinions on child psychology—opinions that are so clearly and obviously beyond the pale of lay opinion testimony as to render their proffer frivolous. The testimony was properly excluded.

■ White also argues that the district court erred in anticipatorily excluding the expert testimony of psychologist Dr. James Lane, whom White would have called in Phase II of the trial had his case survived Walker's motion for a directed verdict. Dr. Lane would have testified that Walker's statements to Mark were a cause of Mark's suicide. The district court ruled that, had Dr. Lane been called, his testimony would have been excluded on the ground that the reliability and foundation of Dr. Lane's opinion was highly questionable.

The only issues that will remain in this case on remand are (1) whether Walker is entitled to qualified immunity; and (2) if not, whether Walker violated the Fourth Amendment by stopping Mark's vehicle or by seizing Mark's person. Dr. Lane testified in his proffer only that Walker's *statements* contributed to Mark's suicide—but we have already determined that Walker's statements were not tortious conduct. Dr. Lane did *not* testify that the seizures of

---

20. Miss.Code Ann. § 43–21–301(2) (Supp.1991) (emphasis added); *see id.* § 43–21–303(1).

21. *Id.* § 43–21–159(1) (emphasis added).

Mark's vehicle and Mark's person, in and of themselves, were contributing factors to Mark's suicide. Dr. Lane's testimony, at least in the form offered, is therefore irrelevant to a determination of the issues in this case. Accordingly, whether the district court properly excluded his testimony at trial is a moot issue.

## V

White insisted at oral argument that we should remand to allow him to present his proof against the Town of Verona. White's brief on appeal, however, raised no issue with respect to the Town, nor does the record reveal that White objected below on the ground that the district court's unusual bifurcation order unfairly deprived him of an opportunity to make his case against the Town. The law in this Circuit is well established: Issues not raised in a party's brief are waived.[22] The issue of the Town's liability, therefore, is not before us.

The judgment of the district court granting Walker qualified immunity is REVERSED and the cause REMANDED for proceedings consistent with this opinion. The judgment is in all other respects AFFIRMED.

---

**22.** *See Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1539 n. 14 (5th Cir. 1984).