### Tom GLASGOW and Sheron Glasgow, Plaintiffs,

v.

### SHERWIN–WILLIAMS CO., Defendant.

### No. 1:94CV126–S–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

Oct. 24, 1995.

---

Steven R. McEwen, Dunn, Webb, McEwen & Studdard, P.A., Columbus, MS, for Plaintiffs.

Kenneth E. Milam, Walter J. Brand, Watkins & Eager, PLLC, Jackson, MS, for Defendant.

## OPINION

SENTER, Chief Judge.

In this case, plaintiffs assert violations of the ADEA and state law in connection with the termination of one of the plaintiffs from his employment with the defendant. Presently before the court is defendant's motion for summary judgment.

## DISCUSSION

The plaintiff, Tom Glasgow (Glasgow), worked for the defendant, Sherwin–Williams Co., for twenty-three years. At the time of his termination, he was the manager of the Columbus, Mississippi, Sherwin–Williams store and was approximately forty-six years old. Sheron Glasgow (Sheron), the other plaintiff in this case, is Glasgow's wife and has never been employed by Sherwin–Williams. The events leading up to Glasgow's termination, taken in the light most favorable to him, are as follows:

On January 21, 1993, Sherwin–Williams suspended Glasgow while it investigated certain allegations made against him. These allegations involved claims of sexual harassment at the 1992 and 1993 national sales meetings and a knife incident at the 1993 meeting. By letter dated February 1, Glasgow was reinstated. The letter, signed by Michael Beres, a director of personnel, specifically referenced only the sexual harassment incidents and concluded with the following remarks:

> Your response to these issues, although varied, certainly raises concerns about your professionalism and general behavior while among peers. The types of behavior exhibited at these meetings or any other business functions are completely unacceptable to the Company and will not be tolerated.
>
> While the decision has been made to reinstate you to your position as Store Manager, you must understand that you will be terminated from the Company if another incident like this or similar to this occurs.

When asked about the meaning of this language, Beres stated:

> What I meant by that, if there was anything that even resembled anything that happened at that meeting, that he would probably be terminated at that time.

> \* \* \* \* \* \*

> [T]hat if any incident that came about, that we did not know of or whatever, that anything that had to do with that, for instance, if something had happened in the previous year, that we had just found out about it, we would open up the investigation and look into that.

Glasgow believed that the matter was dropped until he received a phone call from Bill Hearndon, who questioned Glasgow again about the 1993 sales meeting. Approximately a week later, Glasgow was summoned to a meeting with Hearndon, Beres, and Rufus Stevens, a district manager. At that time, Glasgow was confronted with allegations that he had stabbed a fellow Sherwin–Williams employee at the 1993 meeting. Glasgow denied the allegations, and when he refused to resign, he was terminated.

This action ensued. In it, Glasgow charges that Sherwin–Williams terminated him in violation of the ADEA and state law, including wrongful termination, intentional and negligent infliction of emotional distress, invasion of privacy, fraud and misrepresenta-

tion, and wrongful retention of a watch and denial of a trip, this last charge being the only one levied by Sheron also. Sherwin–Williams has moved for summary dismissal of each of these charges, which will be discussed in turn.

## DISCUSSION

### I. ADEA Claim

■ On a motion for summary judgment in an employment discrimination case, the court

must assess whether [plaintiff] tendered factual evidence that would lead a jury to reasonably conclude that [defendant's] reasons are a pretext for ... discrimination.... [B]ecause [plaintiff] would be required to prove at trial, through a preponderance of the evidence, that [defendant's] proffered reasons are a pretext for age discrimination, he must now produce sufficient evidence to establish that [defendant's] reasons were pretexts *for age discrimination.*

*Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955, 958 (5th Cir.1993) (emphasis in original). "*St. Mary's [Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)] requires more of the plaintiff than simply negating the employer's defense.... [A] court considering summary judgment must decide whether plaintiff's facts, if believed, would prove that, more likely than not, the employer fired the employee because of his age." *Bodenheimer,* 5 F.3d at 959 n. 8.

■ To meet this summary judgment burden, Glasgow directs the court's attention to two matters: (1) the alleged age-based comments made by superiors and (2) the alleged preferential treatment of younger employees. As to the first, Glasgow presented evidence that in February, 1988, the president of Sherwin–Williams said something to the effect that "the company needed to move out some old people and bring in new young blood." He also presented evidence that another Sherwin–Williams official, in reference to certain store managers, stated, "[W]e've got to find a way to get rid of these son of bitches. They make too much money." This

statement was allegedly made sometime between June, 1983, and January, 1987.

With respect to these alleged comments, Sherwin–Williams argues that they "do not create a triable issue of fact" as they are "completely remote in time to Glasgow's discharge and therefore ... not relevant on the issue of whether there was any age animus associated with Glasgow's discharge...." Glasgow's naked response to this argument is that "[t]hese statements do indeed constitute direct evidence of age discrimination on the part of [Sherwin–Williams] and are admissible evidence in the trial of this case."

The court disagrees. The Fifth Circuit has repeatedly found in recent opinions that "a single comment, made several years prior to the challenged conduct, is a stray remark too remote in time to support an inference of ... discrimination in later employment actions." *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995); *see also Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 153 (5th Cir.1995) (remarks that testifying employee was " 'getting old' " and " 'losing her memory' " were " 'stray remarks' which were too remote and vague to be probative of age discrimination against [plaintiff]"). Accepting as true Glasgow's evidence that these comments were indeed made, the court nevertheless finds them insufficient to raise a genuine issue of material fact on Glasgow's claim that he was terminated because of his age. Neither comment is particularly directed toward Glasgow, and both are too remote in time to be probative, having been made anywhere from five to ten years before Glasgow's discharge.

■ With that in mind, the court turns to the question of whether Glasgow's remaining evidence, which addresses the alleged preferential treatment of younger employees, is sufficient to withstand summary judgment. Glasgow points to incidences involving two other Sherwin–Williams employees, both of whom were in their twenties at the time and were not discharged for allegedly similar conduct. Those employees were Terry Hartness, a Sherwin–Williams store manager, who, while attending the 1993 sales meeting, tried to "pick up" a Waffle House waitress and was escorted from the premises by the

police, and Sean Gardner, a nonmanagerial employee, who, approximately one month after Glasgow's discharge, was found guilty of speeding, resisting arrest, and reckless driving after leading police on a 125 mile per hour chase. Although both admitted their wrongdoing, neither was disciplined in any way for his conduct.

The court does not believe that the acts of either Hartness or Gardner are substantially similar enough to Glasgow's alleged acts to aid his cause. See *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980), (court should examine whether younger employees who engaged in similar acts were not punished similarly). Neither incident involved fellow employees or transpired during the course of a company sponsored function. Although the waitress incident occurred while Hartness was attending his employer's national sales meeting, at the time he accosted the waitress, Hartness was on a private dining excursion and was not on the premises where the meeting was being conducted. Furthermore, neither the Hartness nor Gardner incidents involved unwanted touching or intimidating behavior. Granted, the police were involved in those matters and were not called in on the Glasgow incidents, but that fact, in and of itself, does not persuade the court that Sherwin–Williams acted in a discriminatory manner in handling the charges against Glasgow. Moreover, Gardner and Glasgow occupied different positions within the company; Gardner was a nonmanagerial employee while Glasgow was a store manager.

■ Even if all of Glasgow's evidence is taken as true (as it must be) that he was innocent of all of the charges levied against him, he has, at most, shown that Sherwin–Williams' proffered reason for firing him is false. This is simply insufficient, for he must prove not only that Sherwin–Williams' proffered explanation was false but also that discrimination lay at the heart of its decision. To survive summary judgment, Glasgow, of course, need only raise a genuine issue of material fact on this point, which, in this court's opinion, he has failed to do on the age

discrimination charge. That claim is therefore dismissed with prejudice.

## II. State Law Claims

### A. Wrongful Termination

■ Glasgow charges that he was wrongfully terminated despite a binding contract of employment and in violation of the duty of good faith and fair dealing attendant to all employment relationships. Glasgow bases his contract claim on the Beres letter advising him of the results of the investigation into the sexual harassment charges. Glasgow argues that Beres' statement warning Glasgow that he would be terminated "if another incident like this or similar to this occurs" amounted to an agreement to terminate him only for future infractions, not for anything that happened in the past, and therefore constituted a contract for continued employment. During his deposition, he characterized the "agreement" as follows: "[W]e had an agreement, that as long as I did nothing else, I had no more violations from the date that [Beres] and I sat down and talked, that everything was fine."

In response, Sherwin–Williams points to Glasgow's admission that he did not have a written contract of employment with the company; Glasgow was therefore an employee-at-will and terminable for any reason whatsoever, except, of course, an illegal reason. It also argues that the Beres letter cannot be read to constitute a guarantee of employment for any specific period of time and does not limit the company's right to terminate Glasgow at will. Alternatively, it contends that even if Beres' letter could be construed as an attempted modification of Glasgow's at-will status, it is legally invalid, as Glasgow has offered no evidence that he gave any additional consideration in support of the modification.

■ Without a doubt, Glasgow was an employee-at-will at the time of the Beres letter—he admits he had no written contract of employment with Sherwin–Williams. Glasgow could therefore be terminated at Sherwin–Williams' will unless the Beres letter acted to modify his at-will status. Having carefully considered the matter, the court is

of the opinion that the subject letter has no such effect. The letter contains no definite period of continued employment. Because "Mississippi follows the common law rule that a contract of employment for an indefinite amount of time may be terminated at the will of either contracting party," *Rosen v. Gulf Shores, Inc.*, 610 So.2d 366, 368 (Miss. 1992), the Beres letter did nothing to alter the at-will relationship between Glasgow and Sherwin–Williams. The only way that this letter could alter that employment relationship, then, is "if it were supported by a 'valuable consideration outside the services which [Glasgow] renders from day to day.'" *Windfield v. Groen Division, Dover Corp.*, 740 F.Supp. 1230, 1232 (S.D.Miss.1990) (citation omitted). Without independent consideration, employment "'is terminable at the pleasure of either party.'" *Windfield*, 740 F.Supp. at 1233 (citation omitted). "[I]t is the plaintiff's burden to prove consideration." *Id.* As Glasgow has not presented any evidence suggesting that he gave additional consideration for his continued employment, he was an employee-at-will and terminable for any reason. Furthermore, the law is clear that "at-will employment relationships are not governed by an implied covenant of good faith and fair dealing." *Hartle v. Packard Electric*, 626 So.2d 106, 110 (Miss.1993). *Cf. McArn v. Allied Bruce–Terminix Co.*, 626 So.2d 603 (Miss.1993) (recognizing two public policy exceptions to employment at-will doctrine); *Empiregas, Inc. v. Bain*, 599 So.2d 971 (Miss.1992) (noncompetition agreement unenforceable when employee fired in bad faith). Under these circumstances, Sherwin–Williams is entitled to summary judgment on Glasgow's state law wrongful termination claims which are hereby dismissed with prejudice.

### B. Intentional and/or Negligent Infliction of Emotional Distress

An action for the intentional infliction of emotional distress occurs "[w]here there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally ... the results being reasonably foreseeable ... even though there has been no physical injury." *Sears, Roebuck & Co. v. Devers*, 405 So.2d 898, 902 (Miss.1981).

"[T]he contours of this 'outrage or revulsion' standard are not clearly defined in the Mississippi case law," *White v. Walker*, 950 F.2d 972, 978 (5th Cir.1991); however, "[d]ecisions rendered by the Supreme Court of Mississippi and federal courts sitting in diversity jurisdiction in the Magnolia state on intentional infliction of emotional distress claims consistently turn on whether a plaintiff satisfies the requisite elements set forth in the Restatement (Second) of Torts." *Jenkins v. City of Grenada*, 813 F.Supp. 443, 446 (N.D.Miss. 1993). Comment *d* to Section 46 offers the best explanation of this tort:

> One who by extreme and outrageous conduct intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.... [G]enerally, the case is one in which the recitation of the fact to an average member of the community would arouse as a resentment against the actor, and lead him to exclaim, 'outrageous.' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.

Restatement (Second) of Torts § 46 cmt. d. Furthermore,

> it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id. See also Burroughs v. FFP Operating Partners, L.P.*, 28 F.3d 543, 546 (5th Cir. 1994). "[I]t is the nature of the act itself—as opposed to the seriousness of the consequences—which gives impetus to legal redress." *Devers*, 405 So.2d at 902.

A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes. *Jenkins,* 813 F.Supp. at 447. "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *White v. Monsanto Co.,* 585 So.2d 1205, 1210 (La.1991). *See, e.g., Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654–55 (5th Cir.1994) ("Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress").

In this case, the court finds that Sherwin–Williams' actions in terminating Glasgow were neither extreme nor outrageous but rather " 'fall within the realm of an ordinary employment dispute.' " *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31, 34 (5th Cir.1992) (citation omitted). No reasonable juror could find otherwise, and that claim is therefore dismissed with prejudice.

As to the claim of negligent infliction of emotional distress, the court is of the opinion that it is also not well taken. Although the tort is recognized in Mississippi, *see Sears, Roebuck & Company v. Devers,* 405 So.2d 898 (Miss.1981), the court finds it at odds with the notion of at-will employment. Because Sherwin–Williams could rightfully terminate Glasgow for any reason or no reason at all, the company owed him no duty with regard to the manner in which it effected its decision. Therefore, the motion of Sherwin–Williams for summary judgment on the negligent infliction of emotional distress claim is granted, and that claim is dismissed with prejudice.

### C. Invasion of Privacy

"Although actions for the invasion of privacy have been rare in Mississippi, the tort has received almost universal recognition in the United States.... Mississippi gave implicit recognition to the tort in 1951." *Candebat v. Flanagan,* 487 So.2d 207, 209 (Miss.1986). While four theories underlie this tort, *see Candebat,* 487 So.2d at 209, Glasgow focuses only on the first, the intentional intrusion upon the solitude or seclusion of another. "For this type of invasion of privacy, there is 'no liability unless the interference with plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object.' " *Id.* (quoting Restatement (Second) of Torts § 652B cmt. d (1977)). *See also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 117 (5th ed. 1984).

Glasgow charges that Sherwin–Williams intruded upon his solitude or seclusion when it directed its employees not to associate with Glasgow following his termination. In response, Sherwin–Williams points to the case of *Watkins v. United Parcel Service, Inc.,* 797 F.Supp. 1349 (S.D.Miss.), *aff'd,* 979 F.2d 1535 (5th Cir.1992), in which the court found that defendant had not invaded plaintiff's privacy when it terminated him for violation of an anti-fraternization policy based on plaintiff's relationship with an employee over whom he had management authority. In reaching its conclusion, the *Watkins* court concluded that plaintiff had failed to show any "utterly reckless prying," *Watkins,* 797 F.Supp. at 1360, by defendant of the type found in other cases, such as snooping in someone's bedroom, wiretapping private telephone conversations, or opening and reading private mail without authorization. *Id.* Glasgow points to no case with an analogous fact situation, arguing only that this was "an intrusion into someone's private affairs which is highly offensive to a reasonable person," and the court's substantial research reveals only one other similar case. In *O'Neil v. Schuckardt,* 112 Idaho 472, 733 P.2d 693 (1986), the court found that plaintiff had presented substantial competent evidence upon which a jury could properly determine that defendants, various religious persons, had intruded upon plaintiff's seclusion when they purposely kept his family from seeing him because he was not of the same faith. The court believes that the facts of *O'Neil* clearly fall within the perimeters of this privacy tort and are easily distinguishable from those in

*Watkins* and the case at hand. While a reasonable ordinary man would find interference in the private affairs of a family to be highly objectionable, the court is of the opinion that the instant case does not meet that definition and no reasonable jury could so find. Although the alleged acts of Sherwin–Williams may have been improper in a sense, they were not of the highly offensive nature that case law requires before this tort can be established. As *Candebat* recognizes, to prevail on this cause of action, Glasgow "ha[s] committed [himself] to a much heavier burden," *Candebat*, 487 So.2d at 209, than that required in establishing other privacy torts. In this court's mind, Glasgow has failed in that effort even under applicable summary judgment standards. Sherwin–Williams' motion for summary judgment is therefore granted on the invasion of privacy claim, which is hereby dismissed with prejudice.

### D. Fraud and/or Misrepresentation

■ Glasgow charges that Sherwin–Williams engaged in fraud and/or misrepresentation on three occasions involving (1) a company sponsored contest for a trip to Cancun, Mexico, (2) the Beres letter, and (3) the procurement by Hearndon of Glasgow's statement. The second of these can be easily disposed of—the letter contained no guarantees of continued employment, as previously explained, and thus, there is no fraud or misrepresentation inherent in that document. The court also finds no fraud or misrepresentation in the way Sherwin–Williams handled the 1992 contest which resulted in Glasgow being awarded a trip to Cancun, Mexico, and a diamond for his watch. This allegation, which is more in the nature of a breach of contract, will be more fully explored in the next section of this opinion. Finally, the court finds that Sherwin–Williams is entitled to summary dismissal of the allegation that Hearndon improperly procured Glasgow's statement by not advising Glasgow of all the charges against him when the two men discussed the 1993 sales meeting over the telephone. Glasgow was an at-will employee to whom the company owed no duty of good faith and fair dealing; Sherwin–Williams officials were therefore free to conduct their investigation of alleged misconduct in whatever manner they chose. Surreptitiousness is not synonymous with fraud. As there are no genuine issues of material fact involved in the allegations of fraud and misrepresentation and as Sherwin–Williams is entitled to judgment as a matter of law thereon, those claims are summarily dismissed with prejudice.

### E. Wrongful Retention of Watch and Denial of Trip

#### 1.

■ Glasgow charges that Sherwin–Williams unlawfully retained a watch that he had sent to the company for repair over a year before filing suit. It is undisputed that the watch was returned to Glasgow shortly after this action was filed. Sherwin–Williams seeks dismissal of this claim based on the following exchange which occurred during Glasgow's deposition:

Q So, as far as, I guess, this portion of your complaint, you have been satisfied with respect to receipt of the watch?

A I have been satisfied by the watch. But the little bit of, well, I guess it is just strange to me what could take so long and then get it so quick after so many inquiries about it.

Sherwin–Williams argues only that this is an admission by Glasgow that this portion of his claim has been satisfied and should be dismissed. In response, Glasgow maintains that the company has "completely mischaracterize[d]" his statement and that he was only acknowledging that the watch had been satisfactorily repaired, not abandoning his claim that Sherwin–Williams had wrongfully retained his watch.

Having carefully considered the matter, the court is of the opinion that Sherwin–Williams is not entitled to summary dismissal of this claim. Glasgow has adequately explained his answer to an awkwardly worded question. Although the theory underlying this claim is unclear (conversion, trespass to chattels, negligence, or some other tort) and the amount of damage unknown, the court cannot summarily dismiss it under the circumstances, Sherwin–Williams having failed

to base this part of its motion on any other grounds.

### 2.

Glasgow also charges that Sherwin–Williams wrongfully denied him a trip to Cancun, Mexico. Sherwin–Williams awarded Glasgow the Cancun trip, which the company valued at $1,500.00 per person, and a diamond for his watch for meeting certain sales goals in 1992 which are outlined in the company's Spectrum of Excellence Recognition Program. According to Glasgow, this trip "was part of an award for being in the President's Club once again. We were awarded that trip as an incentive to do better each year." The award was made during the 1993 sales meeting but was withdrawn after Glasgow's termination, only days before he was scheduled to leave for Cancun. A company official instructed Glasgow to return the tickets to the travel agent because "it was not in the company's best interest for him, nor would it be in his best interest for him to attend that meeting, given the circumstances of his parting with the company."

Sherwin–Williams seeks summary dismissal of this claim on the basis that Glasgow was not entitled to the trip either contractually or otherwise. It argues first that although the contest rules made no provision for a situation similar to that at hand, the company had reserved "the right to change the contest rules and/or the contest awards," thereby "sufficiently disclaim[ing] any purported contractual obligation associated with the contest or any resulting awards." Sherwin–Williams also maintains that the trip was a "gratuitous employment benefit such as paid vacation and holidays, which could be withdrawn at any time" and that Glasgow gave no consideration for the trip, as the "only thing Glasgow did to obtain the trip was to do the job he was already obligated to do." In response, Glasgow argues that there was no written rule prohibiting a discharged employee from going on the trip and points to the diamond which he won in the same contest as an admission that Sherwin–Williams knew that he was entitled to the trip. Glasgow also maintains that Sherwin–Williams "benefitted monetarily by the store manager's efforts in reaching these goals set in the 1992 contest" and contends that Sherwin–Williams "got what it wanted from ... Glasgow in this contest when he worked diligently and faithfully ... to meet the goals" established by Sherwin–Williams.

After careful deliberation, the court is of the opinion that Sherwin–Williams is not entitled to summary dismissal of this claim, which the court interprets as involving a breach of contract. "In the legal sense, payment of a prize to a winner of a contest is the discharge of a contractual obligation. The acceptance by the contestants of the offer tendered by the sponsor of the contest creates an enforceable contract." *Robertson v. United States,* 343 U.S. 711, 713, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952). In this case, one has only to look at the official rules of the Spectrum of Excellence Recognition Program to realize that it was established to reward those sales representatives and store managers who increase their sales by at least fifteen percent. By awarding Glasgow the trip and the diamond for meeting the requirements of the President's Club (as opposed to the lower goals of the Leader's Club and the Master's Club), Sherwin–Williams acknowledged that Glasgow fulfilled his end of the bargain, i.e., that, under his supervision, his Columbus store achieved a twenty to twenty-five percent increase in sales. As the company recognized, such performance was to "everyone's benefit." Granted, the company reserved the right to change the rules and/or the awards, but the court does not believe that this reservation altered the contractual nature of the undertaking or gave Sherwin–Williams carte blanche to change the rules/awards *after* it had already bestowed the award and begun the 1993 program. It goes without saying that Sherwin–Williams was not required to sponsor this contest, just as it was not required to give its employees paid vacations and holidays. However, when it offered this incentive for superb performance and Glasgow accepted the offer, contractual obligations arose, which Sherwin–Williams initially discharged. Since that time, the company has altered the rules to deal with discharged employee participants and to disclaim the contractual nature of the program. Although the court appreci-

ates the awkward position the company found itself in when it fired Glasgow for improper conduct only days before he and his wife were scheduled to depart on the company trip, that does not alter the court's finding that Sherwin–Williams is not entitled to summary judgment on this claim.

### F.  Sheron Glasgow's Claim

██  Sheron's only claim is that "she was entitled to take the trip to Cancun, Mexico, with her husband." That may be true, but, as Sheron was not an employee of Sherwin–Williams and did not win the award herself, it does not state a legally cognizant cause of action. Sherwin–Williams is therefore entitled to summary judgment on this claim, which is dismissed with prejudice.

### CONCLUSION

Having carefully considered the evidence, the applicable case law, and the argument of counsel, the court is of the opinion that Sherwin–Williams is entitled to summary judgment on all claims except those relating to the retention of the watch and the denial of the Cancun trip. Under these circumstances, the court believes it would be derelict in its duties if it did not encourage the parties "to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement," *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 720 (5th Cir.1974), of the remaining issues, especially given the limited monetary value of those claims and the expense of continuing this litigation through trial.

An appropriate order shall issue.