Richard HARE, Natural Father and Next Friend of Haley Hare, a Minor, and Richard Hare, Individually and in His Official Capacity as Administrator of the Estate of Tina Hare, Plaintiffs,

v.

The CITY OF CORINTH, MISSISSIPPI, a Municipal Corporation; Edward S. Bishop, Sr., Mayor of the City of Corinth, Mississippi; Jack Holt, Former Mayor of the City of Corinth, Mississippi; The City of Corinth, Mississippi, Board of Alderman; James C. Harrison, Alderman; Donald Joe Sanders, Alderman; George P. Chambers, Alderman; E.G. Holloway, Alderman; Lex Mitchell, Alderman; Fred Johnson, Individually and in His Official Capacity; Captain Billy Clyde Burns, Individually and in His Official Capacity; Captain James Damons, Individually and in His Official Capacity; Brenda Moore, Individually and in Her Official Capacity; John Doe and XYZ Corporation, Defendants.

No. EC 91-248-D-D.

United States District Court,
N.D. Mississippi, E.D.

March 1, 1993.

Ronald D. Michael, Booneville, Miss., for plaintiffs.

Gary E. Friedman, Susan D. Fahey, Steven J. Allen, Jackson, Miss.; for defendants.

MEMORANDUM OPINION

DAVIDSON, District Judge.

This is a 42 U.S.C. § 1983 cause of action which arose out of the suicide death of Tina Norene Hare on July 4, 1989, while detained in the City of Corinth jail. Ms. Hare's husband filed suit in his individual and official capacity as the administrator of his wife's estate against the aldermen of the City of Corinth, the mayor, chief of police, and other custodial law enforcement officers of the City of Corinth, Mississippi. The cause of action is based on the alleged constitutional violations of Ms. Hare's Fourth, Fifth, Eighth and Fourteenth Amendment rights; and, there is a state law claim based upon the Mississippi Wrongful Death Statute, *Miss.Code Ann.* § 11-7-13 (Supp.1992).

At this stage of litigation, an active period for discovery has passed, and both parties have filed motions for summary judgment as to all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. After careful consideration of the record and briefs in this case, the court finds that defendants' motion for summary judgment as to the state law claim is well taken, and the same is hereby granted. However, as to the principle cause of action pursuant to 42 U.S.C. § 1983, defendants' motion for summary judgment is denied. Likewise, plaintiff's cross-motion for summary judgment is denied in full.

Since both parties have moved for summary judgment regarding the same issues, the court finds that it can effectively address both motions within the context of the same discussion. Hence, the following section presents a review of the alleged facts as such appear from the pleadings and exhibits. The court emphasizes that the following are the alleged facts as reflected in the deposition excerpts, affidavits, admissions, interrogatories, exhibits, etc. Of course, assertions of fact which are advanced by only one party and factual disputes between the parties will be duly noted. As the following demonstrates, there are several disputes of material facts in this case.

*The Alleged Facts*

In the early morning hours of July 4, 1989, the Booneville Police Department contacted the Corinth Police Department and advised that Tina Hare had been arrested on warrants for petty larceny and forgery. Officer Larry Fuqua of the Corinth Police Department picked up Ms. Hare at the Booneville Police Department and transported her to the Corinth jail. The plaintiff alleges that

Booneville police informed Officer Fuqua that Ms. Hare was a "heavy drug user," a fact which defendants deny. In any event, Ms. Hare was jailed in the City of Corinth jail at approximately 1:45 a.m. on July 4, 1989.

According to the deposition testimony of Ms. Hare's husband, Richard Hare, he received a phone call from his wife after she was received into the Corinth jail. This was the first time that Tina Hare had ever been in jail, and her husband testified that she seemed scared and frightened. Tina informed her husband that nothing could be done to secure her release until after 8:00 a.m. Although Tina made no mention of any suicide thoughts during the phone call, Richard Hare stated that she had mentioned suicide during an altercation that he had with her the previous day, July 3, 1989. According to Mr. Hare, he did not take his wife's statement about suicide seriously; therefore, he did not tell anyone about the comment.

Later in the morning, Richard Hare contacted Tina's parents, Mr. Guy Taylor and Ms. Patricia Morgan, and informed them that their daughter was in the Corinth jail and needed help. Mr. Taylor, Ms. Morgan and Richard Hare met at some point in the morning, and a decision was made that Tina's parents would go to the jail at 8:00 a.m. to try to get their daughter released while Richard stayed home with the couple's baby daughter. At approximately 8:00 a.m., Mr. Taylor and Ms. Morgan went to the jail and met briefly with Captain Billy Burns. Capt. Burns informed Tina's parents that she was not ready for release, and the investigation concerning their daughter would take some time to complete. He instructed them to return home and wait for his call.

In his deposition testimony, Capt. Billy Burns stated that he was informed that Tina Hare was a suspect with regard to a check forgery case, and he first met with Tina at approximately 10:00 a.m. on July 4, 1989. In the interview, Tina informed Capt. Burns that she was an addict with a Dilaudid habit and that her habit was financed by writing checks. According to Capt. Burns, Tina was depressed about being in jail. She stated that she was an unfit mother, and she expressed concern about how her husband would react to her predicament. During the interview, Capt. Burns observed that Tina was going through withdrawal, which he associated as a normal reaction to her drug use. She sat with both feet in a chair in a defensive, "fetal-type" position. Furthermore, Burns learned during the interview that Tina was scheduled to enter a drug rehabilitation treatment program the very next day, July 5, 1989, in Tupelo, Mississippi.[1] At some point in the interview, however, Tina's mood improved when she learned that her bond amount would not be as high as initially expected. Tina was then allowed to call her parents to ask them to return to the jailhouse to assist with her bond so that she could be released that afternoon. However, these plans never materialized. The record before the court indicates that Capt. Burns had been videotaping the interview. At some point, Burns apparently left the room, and when he returned, he observed that Tina had substituted another tape for the one which was in the recorder. The tape recording of the interview was subsequently found in a garbage can, and the tape had been damaged. In the meantime, additional charges came in on Tina Hare, and when Mr. Taylor and Ms. Morgan arrived at the jail at approximately 12:00, Capt. Burns informed them that Tina could not go home:

> And during this period of time is when the other charges had come in, prior to her mother and daddy getting there, the best I remember. And when they arrived, I informed them that under the circumstances that we would not be able to release Tina until we were able to get all of the checks and determine exactly what had happened, and also the fact that she had stolen the tape from my office and part of it—had destroyed part of the evidence.

Although Tina was not released to her parents, she was allowed to visit with them. During this private meeting with her daugh-

1. It appears from the record that her plans to enter the drug rehabilitation center were made prior to her arrest of July 4, 1989, and such plans were "voluntary"—in other words, not compelled or suggested by any court or law enforcement agency.

ter, Ms. Morgan described Tina as "emotionally distraught."

Q. What did she say?

A. She said that she didn't take the checks, that she did go in the store and cash one. 'Please get me out of here, Mother. I can't stand this. I can't bear this. Please get me out.' Holding her stomach, rocking the whole time. Just very distraught. Just—so emotionally distraught. Even got up like she was going to leave the building and I had to, you know, tell her that, you know, 'You can't leave the building, Tina. You have to stay here. We have to work through this.'

And we asked Mr. Burns to release her, and I had told him that she was going to the rehabilitation center the next day, to just let me go ahead and pay her bond and carry her on down there....

Capt. Burns described Tina's mood as "hyper" and "frantic" during the time that her parents were at the jail.[2] Tina attempted to convince Capt. Burns not to hold her in jail another night. At this point, Tina Hare threatened suicide, but Capt. Burns did not consider the threat serious.

Q. Yet she had threatened to do harm to herself if she had to stay.

A. She made those statements; however, they were not made in a tone of voice that was believable.

Q. What kind of tone of voice did she use?

A. It was in a tone of voice of a threat or a bribe, rather than a sincere statement.

Q. Okay.

A. In other words, her remarks basically were, 'If you don't let me go home, I'll kill myself.'

Tina's father, Guy Taylor, also heard his daughter's statement about suicide. Contrary to Capt. Burns, Mr. Taylor testified that the statement was made in a serious, believable tone of voice:

A. ... He had carried Tina back there and started to lock her up. And Tina told him, said, 'I'll not stay in here tonight.' Said, 'I'll kill myself.'

Q. You heard her say that?

A. Yes, sir, I sure did.

Q. And she was back in the cell area when she said that?

A. No, sir. She was out front before they carried her back in the cell. Out front, you know, before they went back in.

Q. Okay. Did you think she was serious?

A. I know that kid was serious. You can tell when a kid is serious and when they're not.

At Capt. Burns' deposition, he was asked if he remembered Tina making the statement to him that "her life was in his hands," when he returned her to the jail area following the visit with her parents. Burns replied that it was possible but that he did not specifically remember.

Q. Okay. Do you remember Tina making the statement to you, 'My life is in your hands. My life is in your hands'?

A. It's possible. I don't specifically remember.

After his daughter threatened suicide, Mr. Taylor sought an assurance from Capt. Burns that his daughter would be safe, and Capt. Burns provided that assurance.

Q. ... All right. Did you make any representations to the father as to what you would do to make sure that Tina would be okay, that she would be safe?

A. Yeah.

Q. What did you tell him?

A. I just said, 'I'll do everything I can to make sure.' I assured him that we would do everything within our power to make sure that nothing did happen to her.

Q. All right. Do you recall telling him you would post a guard outside her door?

A. No, sir.

Q. Okay. You don't recall that?

A. No, sir.

At this point, it was approximately 3:00 p.m. Tina's parents left the jail, and Capt. Burns escorted Tina to a cell. In a written statement given on July 7, 1989, Capt. Burns described the sequence of events as follows:

2. This would have been mid-day, approximately 2:00–3:00 p.m.

> Tina was allowed to visit with her parents shortly before 2:00 P.M. She continued to talk to them and me until close to 3:00 P.M. Her parents left and I took Tina to her original cell and was observed by Brenda Moore and Chief Johnson via camera. The Chief instructed me to put Tina in another cell that could be isolated, which I did. Tina had been strip searched before, so I searched her cell, took her shoes and made sure she had no belt. I saw the blanket on the bunk and considered the possibility, but discounted it as remote. Dispatcher Moore was aware of the situation and I assumed she would be on duty until 10:00 P.M.

Although Capt. Burns stated that Police Chief Fred Johnson instructed him to place Tina in a cell which could be isolated, this is a fact which the remaining defendants deny. Furthermore, Capt. Burns explained in his deposition that he discounted the blanket, in part, because he did not consider Tina to be of sufficient strength to tear up the blanket.[3] Capt. Burns left duty for the day at some point after 3:00 p.m. He instructed Brenda Moore, dispatcher, to keep a close check on Tina Hare and to have the trustees check on her. In Capt. Burns' deposition testimony, he stated that his primary concern was Tina's withdrawal syndrome and not so much her suicide threat.

> Well, it was readily obvious that she was on Dilaudid. She could go into withdrawal there. And, of course, I take it without merit she said that she might kill herself; but I was primarily concerned with the withdrawal syndrome.

Ms. Moore acknowledged that Capt. Burns told her that Tina had threatened harm to herself and to keep an eye on her. At 5:00 p.m., Ms. Moore left for home, and Capt. James Damons relieved her from dispatching duties. According to Ms. Moore, she told Capt. Damons that Capt. Burns had left instructions to keep an eye on Tina Hare. This is a fact which Capt. Damons denies. At approximately 6:00 p.m., Capt. Burns called the jail from his home and spoke with Capt. Damons. "I asked him to notify the two trustee prisoners to check on Tina at least every 45 minutes." Following the telephone conversation between Burns and Damons, Capt. Damons sent a trustee to check on Tina Hare. Ms. Hare was found hanging from the bars of her cell with a noose that she had fashioned from a blanket.

In addition to the suicide death of Tina Hare on July 4, 1989, the parties acknowledge that on March 23, 1989, Joel Simmons committed suicide in the Corinth City Jail by hanging himself with his belt. Furthermore, the plaintiffs have submitted affidavits from two alleged experts in the field of police standards and procedures. Dr. George L. Kirkham reviewed the case file in this cause and opined that the City of Corinth was "seriously violative" of nationally accepted standards of law enforcement standards and procedures. Dr. Kirkham identified and explained four major categories in his affidavit which allegedly reflect unsatisfactory performance by the Corinth police in this case. All four categories directly or indirectly pertain to suicide prevention.[4] (Exhibit N). Mr. Joseph R. Rowan, another alleged specialist in the field of law enforcement standards and procedures, reviewed the case file and identified a plethora of deficiencies in his affidavit which allegedly led, directly or indirectly, to the suicide death of Tina Hare. (Exhibit O). Suffice it to say that the court has given careful consideration to both affidavits as well as the appended attachments.

*Summary Judgment*

Summary judgment is an appropriate disposition only if the record reveals that there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. *Federal Sav. and Loan Ins. v. Kralj,* 968 F.2d 500, 503 (5th Cir.1992); Fed.R.Civ.P. 56(c). The pleadings, depositions, admissions, answers to interrogatories and affidavits must demon-

3. Ms. Hare weighed approximately 100 lbs.

4. In broad terms, the alleged deficiencies were as follows: (1) Failure to utilize a safe holding cell which was available; (2) Failure to closely monitor Tina Hare; (3) Failure to have a policy on intake screening of prisoners; (4) Failure to provide personnel minimal training to recognize signs of mental illness.

strate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Furthermore, summary judgment is mandated after adequate discovery and upon proper motion against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the case *sub judice,* an examination of the substantive issues is necessary, to determine whether a disputed fact or inference is material to an essential legal element of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## DISCUSSION

The discussion which follows addresses solely the defendants' motion for summary judgment since they have raised the defense of qualified immunity. Following an exhaustive review of the facts and issues pertaining to the defendants' motion, plaintiff's cross motion for summary judgment can be effectively addressed by brief comment since genuine issues of material fact relevant to the legal issues will be apparent in the consideration of defendants' motion. First, the court considers defendants motion for summary judgment on behalf of the custodial defendants; Police Chief Fred Johnson, Captain Billy Burns, Captain James Damons, and Ms. Brenda Moore.

### *Custodial Defendants*

The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights. *Rhyne v. Henderson County,* 973 F.2d 386, 391 (5th Cir.1992); *Burns v. City of Galveston,* 905 F.2d 100, 104 (5th Cir.1990); *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1188 (5th Cir.1986). The court considers the motion for summary judgment by the custodial defendants very mindful of the potent defensive weapon that qualified immunity can be.[5] Police officers are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *White v. Walker,* 950 F.2d 972, 975 (5th Cir.1991); *Morales v. Haynes,* 890 F.2d 708, 710 (5th Cir.1989). The inquiry, however, is not whether the law or the right was settled, and a court of law is under no requirement to find a "goose case" to impose upon a police officer a constitutional duty to protect a detainee prone to suicide from self-destruction. *Lewis v. Parish of Terrebonne,* 894 F.2d 142, 145 (5th Cir.1990). In the defense of qualified immunity, it merits an emphasis that the standard is not measured by the subjective belief of the particular officer in question. Rather, the standard is an objective one—whether a reasonable officer would know that his conduct is illegal. *Matherne v. Wilson,* 851 F.2d 752, 756 (5th Cir.1988). "The certainty of the law must be measured against an objectively reasonable view of the facts facing an official." *White v. Walker,* 950 F.2d 972, 975–76 (5th Cir.1991), citing, *Anderson v. Creighton,* 483 U.S. 635, 642, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). While the entitlement to qualified immunity may be established as a matter of law by the district court, the proper course is for a jury to evaluate the question if there are triable issues of fact about whether an officer could reasonably believe that his conduct was legal. *White v. Walker,* 950 F.2d 972, 976 (5th Cir.1991); *Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988); *Rakovich v. Wade,* 850 F.2d 1180, 1201 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). Furthermore, the Fifth Circuit instructs that in considering the question of qualified immunity, an offi-

5. Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

cial's knowledge,[6] or not, of a detainee's suicidal tendencies is an important inquiry on the issue of qualified immunity.

> One need not find a 'goose case' to imbue a warden at a jail with a constitutional duty to protect a prisoner prone to suicide from self-destruction. Reference to *Gagne v. City of Galveston,* 805 F.2d 558 (5th Cir. 1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), does not deter us from our course. The custodian in *Gagne* had no knowledge of suicidal tendencies harbored by the detainee. The custodian of one arrested and detained on a charge of public intoxication does not, according to *Gagne,* have a constitutional duty to protect the detainee from self-destruction. But a detainee with suicidal tendencies, a condition known or which should have been known by the warden, requires such protective action in that the detainee presents a risk of damage to himself and other inmates. The substance of *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir.1981), is most enlightening, if not directive. Thus, the defense of qualified immunity is not available to Warden Boquet.

*Lewis v. Parish of Terrebonne,* 894 F.2d 142, 145–46 (5th Cir.1990). For reasons which will be explained in due course, the court is of the opinion that the question of whether or not Tina Hare was "prone to suicide," and the knowledge, if any, that Corinth police officers possessed with regard to that information (*or what they should have known in view of the reasonable officer standard*),[7] is properly the domain of the jury to resolve-not the court at this juncture with only the cold record before it. In *Gagne v. City of Galveston,* 805 F.2d 558 (5th Cir.1986), the suicide detainee was arrested for public intoxication and booked into jail. While Gagne had scars on one wrist from a prior suicide attempt, this fact was unknown to the custodial officer. Later in the night, Gagne committed suicide using his belt to hang himself. *Gagne,* 805 F.2d at 559. The only substantive knowledge that the custodial officer possessed was that Gagne was intoxicated, period. The fact that the officer possessed absolutely no knowledge of a suicidal tendency is implicit in the Fifth Circuit's holding that the custodial officer was entitled to the full measure of qualified immunity. As the above quote demonstrates, *Gagne* was distinguished from the situation which existed in *Lewis v. Parish of Terrebonne,* 894 F.2d 142 (5th Cir.1990). In contrast to *Gagne,* the warden in *Lewis* was aware that the deceased has expressed a death wish; that he had consumed an inordinate number of pills which required emergency medical treatment; that the emergency room physician had ordered a psychiatric examination; that a psychiatric examination had been conducted; that another jail employee believed Lewis was suicidal and should not be left alone; and that Lewis was housed in solitary confinement immediately prior to his death. *Lewis,* 894 F.2d at 145. On the question of suicidal tendency, the record evidence and facts in the case at bar obviously do not rise to the level as those which existed in *Lewis.* However, the suicidal indications were certainly stronger than those which existed in *Gagne.* In sum, the court concludes that the case *sub judice* falls somewhere between *Gagne* and *Lewis,* a fact which counsels the court in determining, along with other considerations, that the "suicidal tendencies" question is best resolved in a jury forum.[8]

In *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court held that the Eighth Amendment's proscription of cruel and unusual punishment is violated when prison officials exhibit "deliberate indifference to serious medical needs of prisoners." The concept of a

6. The court considers knowledge, or not, of Tina Hare's suicidal tendencies by the custodial defendants to be a jury question in this case.

7. One could conclude from a fair reading of *Lewis* that piercing the veil of qualified immunity in § 1983 detainee suicide cases is a two step inquiry. First, there must be a determination that the detainee was "prone to suicide" or demonstrated "suicidal tendencies." Once, and only if, this requirement is satisfied, step two involves an inquiry into whether the official(s) knew, or should have known, of the detainee's "suicidal tendencies."

8. As Judge Wisdom observed in a well-reasoned dissent in *Gagne,* "[t]his case cries for a trial." *Gagne v. City of Galveston,* 805 F.2d 558, 561 (5th Cir.1986) (Wisdom, J., dissenting).

serious medical need as articulated in *Estelle* has two components. One relates to the consequences of a failure to treat, and the other relates to the obviousness of those consequences. *Colburn v. Upper Darby TP.*, 946 F.2d 1017, 1023 (3d Cir.1991). The detainee's condition must be such that a failure to treat can be expected to lead to unnecessary suffering, injury, or death. *Colburn II*, 946 F.2d at 1023. Additionally, the condition must be one that has been diagnosed by a physician as requiring treatment, or, *one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.* *Colburn II*, 946 F.2d at 1023 (emphasis added).

The Fourteenth Amendment due process rights of a pre-trial detainee [9] are at least as great as the Eighth Amendment protection afforded a convicted prisoner via *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1186–87 (5th Cir.1986). Judge Wisdom explained the standard of care in *Partridge* as follows:

> Under the *Bell v. Wolfish* standard, the defendants had a duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective, failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation under *Bell v. Wolfish*.

*Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1187 (5th Cir.1986). As *Partridge* explains, the duty "not to be deliberately indifferent" is the *minimum*. Following the lead of the Fifth Circuit, the Third Circuit also employs a "reckless or deliberate indifference" level of culpability in detainee suicide cases. *Colburn II v. Upper Darby TP.*, 946 F.2d 1017, 1024 (3d Cir.1991); *Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir.1989); *Freedman v. Allentown*, 853 F.2d 1111 (3d Cir.1988); *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). In *Colburn II*, the Third Circuit recognized that it had inconsistently employed both terms, "reckless indifference" and "deliberate indifference" when referring to the standard of conduct. *Colburn II*, 946 F.2d at 1024; *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir.1989); *Colburn v. Upper Darby TP.*, 838 F.2d 663, 669 (3d Cir. 1988). The court expressly declined to distinguish or precisely define the two concepts noting that both, or either, reflect a level of culpability higher than a negligent failure to protect from self-inflicted harm. *Colburn II*, 946 F.2d at 1024. *Colburn II* discussed the three elements of proof required of a plaintiff in a prison suicide case.

> [A] plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability.

*Colburn II*, 946 F.2d at 1017.

The particular vulnerability to suicide speaks to the inherent risk in the detainee's condition, and the requirement of deliberate indifference implies that there is a strong likelihood, rather than a mere possibility, that self-inflicted harm will result. *Colburn II*, 946 F.2d at 1024; *Torraco v. Maloney*, 923 F.2d 231, 236 (1st Cir.1991); *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir.1990). Considering the evidence in the light most favorable to the plaintiff and all reasonable inferences, one could assess Ms. Hare's vulnerability to suicide with the following facts in mind. Ms. Hare was a youth-

9. A pre-trial detainee has a Fourteenth Amendment due process right to be free from punishment altogether. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

ful offender who had never been in jail before. She was under the influence of a chemical drug, Dilaudid, and she exhibited severe mood swings which included some periods of withdrawal. At times she exhibited emotionally distraught behavior and at other times behavior which was called "frantic." During her morning interview with Capt. Burns, she sat in a fetal-type position which Capt. Burns described as a defensive posture. She made statements about being an unfit mother which could reflect poor self-esteem, and she was deeply concerned about how her family would react to her situation. She exhibited irrational behavior at different points throughout the day such as attempting to destroy a videotape of her detention interview. And, it is no small consideration that she said she would kill herself if she had to stay in jail another night. This is enough for a jury question on the issue of Tina Hare's particular vulnerability from which a reasonable jury could find a strong likelihood of suicide.

The second factor is that the custodial officer or officers knew or should have known of that vulnerability:

> '[S]hould have known,' as used in *Colburn I,* is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. The 'strong likelihood' of suicide must be 'so obvious that a lay person would easily recognize the necessity for' preventive action, *MCCI* [*v. Lanzaro*], 834 F.2d [326] at 347 [3d Cir. 1987]; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Colburn II,* 946 F.2d at 1025.

The custodial defendants hang their hat, or most of it, on this second factor of the *Colburn* equation. To this end, the custodial defendants wage an adamant argument that Capt. Burns did not take seriously Tina Hare's threat of suicide. The defendants point to numerous instances in Capt. Burns' deposition testimony where he repeatedly stated that he did not think that Ms. Hare's suicide statement was serious. Be that as it may, the court finds that the second *Colburn* factor presents the classic jury question upon which there is genuine dispute of a material fact. Mr. Taylor, Tina's father, heard the same threat of suicide that Capt. Burns heard. Mr. Taylor testified that the threat was serious: "I know that kid was serious. You can tell when a kid is serious and when they're not." Captain Burns' subjective belief of the seriousness of the statement is not the criteria by which one is to determine whether the officer knew or should have known of the vulnerability. Rather, the criteria is an objective one viewed in light of what a reasonable officer or lay person would appreciate as a strong likelihood of suicide. *White v. Walker,* 950 F.2d 972, 975 (5th Cir.1991). Viewing the evidence in the light most favorable to the plaintiff and keeping in mind the crucial jury role in making credibility choices, a jury could choose to believe Mr. Taylor's testimony that the threat was serious and disbelieve or give little weight to Capt. Burns' testimony that the threat was not serious. Furthermore, a reasonable inference from Capt. Burns' off-duty telephone call to the police station to check on Tina Hare could lend credibility to the seriousness of the threat as expressed by Tina's father. Finally, while the above discussion focuses on the knowledge that Hare's threat might have imparted upon an objective, "lay person," the threat of suicide is not considered in a vacuum. As discussed in the preceding paragraph, the record contains evidence of other red flags concerning Tina Hare's behavior from which a jury could conclude that the custodial officers knew or should have known of a vulnerability to suicide.

The third essential element in the plaintiff's burden of proof is whether the officers acted with reckless indifference to the detainee's particular vulnerability. *Colburn II,* 946 F.2d at 1023. For our purposes, the court recognizes that the preferred ex-

pression of the standard in the Fifth Circuit is "deliberate indifference," rather than "reckless indifference." *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir. 1992); *Burns v. City of Galveston,* 905 F.2d 100, 103 (5th Cir.1990); *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1188 (5th Cir.1986). In defense of the third element of plaintiff's burden of proof, the custodial defendants wage an adamant argument that their actions, at worst, could only be viewed as negligence, not deliberate indifference. Specifically, the defendants argue that Capt. Burns removed Hare's shoe laces, checked to see if she had a belt, and considered the possibility of the blanket but deemed it remote. Furthermore, Burns left instructions with Ms. Moore to keep a close check on Tina, and he called the jailhouse while off duty for the purpose of following up on her situation. These acts, defendants argue, do not reflect a course of conduct typical of deliberate indifference; rather, they merely reflect an error of judgment in leaving the blanket in the jail cell. The argument is compelling, and if it consisted of the only record evidence in this case, it might prevail at this juncture. However, there are other compelling factors which weigh against a hasty conclusion. A jury could well consider the fact that another suicide occurred in the jail only three and one-half (3½) months prior, an event which had to be fresh on the minds of all personnel at the Corinth jail. Despite the prior suicide, a chemically dependent, youthful, first time offender,[10] undergoing withdrawal and depression, and who had made a threat of suicide and exhibited unstable behavior in the hours preceding her death, was placed alone in a cell that allowed no full time observation. The custodial officers were three floors below in a four story building, and there was no means of visual observation into the cell where Hare was housed.[11] There are no easy answers or judicial shortcuts to be sanctioned here. The undersigned concludes that enough evidence and reasonable inferences exist at this point so that a reasonable juror could determine that the conduct of the custodial defendants fell somewhere between the parameters of negligence and deliberate indifference (negligence and deliberate indifference inclusive).

While much of the discussion pertaining to the custodial defendants has centered around Capt. Billy Burns, Chief Fred Johnson, Capt. James Damons and Ms. Brenda Moore are also named as custodial defendants. While there is little record evidence regarding Johnson, Damons and Moore, that which does exist raises genuine issues of material fact. Ms. Moore stated in her deposition that Capt. Burns told her that Tina Hare had threatened to harm herself and that she and the trustees needed to keep an eye on Tina. Additionally, Ms. Moore testified that she informed Capt. Damons that Burns left instruction to keep an eye on Tina Hare. In his deposition, Capt. Damons denied that Ms. Moore said anything to him about Tina Hare. Furthermore, Capt. Burns' statement and deposition testimony indicate that Chief Johnson instructed him to place Tina in a cell which could be isolated. In the record before this court, the defendants deny that Chief Johnson had any involvement and/or knowledge of Tina Hare's condition or that he issued any relative instructions as to her care.[12] Resolution of the conflicting testimony between Burns, Johnson, Damons, and Moore involves the very credibility choice which finders of fact are called upon to make. Furthermore, a jury resolution of this question would inherently influence any determination regarding the custodial defendants' conduct in the sphere of negligence vs. deliberate indifference. For example, if Damons was unaware that Tina Hare posed a risk of harm to herself, he could not be deliberately indifferent. *Elliott v. Cheshire County, New Hampshire,* 940 F.2d 7, 11 (1st Cir.1991).

10. Ms. Hare's husband testified that it was her first time in jail. There is nothing in the record to contradict.

11. The record reflects that video monitoring existed in the hallway of the jail but did not extend into the cell area. There was an audio system in place which allowed monitoring of sounds in the cells.

12. See Defendants' Response to Plaintiff's Statement of Material Facts, item 20.

In summary, material facts exist whether Tina Hare presented a particular vulnerability to suicide which the custodial defendants knew or should of known and whether they responded reasonably or with deliberate indifference. These issues of fact cannot be resolved at the summary judgment stage. *See, e.g., Elliott v. Cheshire County,* 940 F.2d 7, 12 (1st Cir.1991). Many require evaluation of the credibility of witnesses which only can be accomplished at trial.

*Municipal Liability*

The plaintiff has also named the City of Corinth as a defendant identifying specifically the Mayor, former Mayor, Board of Aldermen [13] and the Chief of Police [14] in their official capacities. To establish municipal liability under § 1983, a complainant must demonstrate a policy or custom which causes or occasions a constitutional deprivation. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992); *Burns v. City of Galveston,* 905 F.2d 100, 102 (5th Cir.1990); *Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir.1984) (en banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). A municipality can act only through its agents, but it is not vicariously liable under § 1983. *Oklahoma City v. Tuttle,* 471 U.S. 808, 817–18, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985) (plurality); *Monell,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611; *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992); *Benavides v. County of Wilson, Texas,* 955 F.2d 968, 972 (5th Cir. 1992). Therefore, the City of Corinth can be liable for the conduct of the custodial defendants only if they were carrying out City of Corinth policies when they acted. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389–92, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989). Stated differently, Mr. Hare may recover under § 1983 only if he shows that some city custom or policy caused the custodial defendants to deprive his wife of reasonable medical protection from her own suicidal tendencies. *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992); *Burns v. City of Galveston,* 905 F.2d 100, 102 (5th Cir.1990).

The task of establishing municipal liability is formidable. The policy or custom must be a deliberate and conscious choice by a municipality's final policy-making officials. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality)). "While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne,* 973 F.2d at 392, citing *City of Canton,* 489 U.S. at 387, 109 S.Ct. at 1204. A municipal failure to adopt a policy does not constitute an intentional choice unless it can be said that the city was "deliberately indifferent"; and, a failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights. *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205; *Rhyne,* 973 F.2d at 392. In the context of a jailhouse suicide, it is well settled that municipal liability may be premised on a policy or custom that reflects deliberate indifference toward a class of potentially suicidal pre-trial detainees to which Tina Hare belonged, and this deliberate indifference toward the class *caused* constitutional injury to Hare individually. As the court understands plaintiff's cause of action based upon municipal liability, the theory of liability is premised on two fronts. First, plaintiff appears to allege that city officials were aware of the risk of suicide by detainees and the alternatives for pre-

13. Suit against the Mayor and Board of Aldermen in their official capacity is an action against the city. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

14. The plaintiff seeks to establish Chief Johnson's liability as a co-policy maker for the City of Corinth. In this regard, the court merely notes that the Chief of Police is an elected official in the City of Corinth. Chief Johnson testified at his deposition that he was responsible for running his department, which included developing, recommending, and implementing policy with the support and approval of the Mayor and Board of Aldermen.

venting them, yet they chose not to pursue the alternative or acquiesced in a policy or custom of inaction. The second theory of municipal liability is based upon a failure to train.

Regarding the policy of inaction, plaintiff argues that despite knowledge of the March 1989 suicide, there was no meeting by the Chief of Police, the Mayor and Board of Aldermen, to determine if any corrective measures were needed to ensure that no one else died in the Corinth jail. Plaintiff asserts that the city's custom or policy of inaction is predicated upon the city's failure to effect systematic changes to prevent the "next suicide" following the March 1989 suicide death of Joel Simmons. Specifically, plaintiff points to the failure to develop policies relative to potential suicidal detainees such as the lack of a prisoner intake health screening process, failure to properly train its officers, failure to implement video monitoring or policies regarding close monitoring of potentially suicidal detainees, and the failure to effect certain structural changes in the jail facility[15] relative to the safe custodial containment of detainees reasonably known to have suicidal tendencies.

The record at this point contains some contradictory information concerning what the city did, if anything, following the first suicide in March of 1989. Former Mayor Jack Holt testified that the city attempted to promote an individual to safety director for the entire city following the first suicide. However, Alderman George Chambers stated in his deposition that he could not recall any action or discussion whatsoever concerning either suicide death. Pertinent excerpts of Alderman Chambers' deposition testimony follow:

Q. Joel Simmons died. Do you remember Joel Simmons dying on March 23rd, 1989?

A. Yeah.

Q. All right. Between March 23rd, 1989, and July the 4th, 1989, that's some roughly three-and-a-half months, if maybe not that long.

A. Um-hmm.

Q. During that time period was any discussions had between the Board, the chief of police, the police department as a whole as to how to ensure that an incident such as that does not occur again, that is, an inmate dying in your jail?

A. No.

Q. At any time following Joel Simmons' death, did you have a meeting to inquire as to how and why he died?

A. Did not.

Q. Do you think it was your responsibility to know and find out?

A. Yes.

Q. If an inmate dies in your jail facility, who's—I'm not saying if you're liable or not. I don't mean to imply that, but what is your understanding of who's responsible for that person?

MR. FRIEDMAN: Object to the form.

MR. MICHAEL:

Q. While they're in your jail?

MR. FRIEDMAN: Object to the form. Go ahead and answer if you can.

A. I think the Board of Aldermen with the mayor is—should be responsible.

MR. MICHAEL:

Q. All right. Even with that knowledge, you never inquired as to what happened.

A. That's correct.

Q. You never inquired as to how we can keep this from happening again.

A. That's correct.

Q. Were you concerned that this could happen again?

A. Yes.

Q. Why didn't you take any action?

A. Just one of those thing we just didn't—I didn't do.

Q. You or any of the other four—

A. Yeah.

Q. —to your knowledge.

A. That's right.

15. Decedent was housed on the top floor of a four story building while the officers in charge of detainees occupied the first floor.

Q. July 4th, 1989, another prisoner dies in your jail. They hang themselves, which is the same way the first prisoner died. My understanding is no action was taken again.

A. That's correct.

Q. No meeting was had between any—

A. Unh-unh.

Q. —the Board and any police officer in the police department to find out what took place.

A. Not any that I know of or that I'm aware of.

Q. And you attended all the meetings.

A. I don't think I missed any meetings. Not in open meeting there wasn't anything.

(Deposition Testimony of George Chambers, Alderman, T-28-31).

In addition to the deposition testimony of Alderman Chambers and former Mayor Jack Holt, Edward Bishop, the current Mayor of Corinth, testified that he did not recall any special meeting in reaction to the Joel Simmons suicide; however, he indicated that there was some discussion with the police chief about the Simmons suicide at a regular meeting of the Board. By contrast, Alderman Donald Joe Sanders testified that he did not recall any discussion at all about the Joel Simmons suicide.

Clearly, there are genuine issues of material fact regarding whether the city embarked on a policy of deliberate indifference toward the suicide deaths in the Corinth jail. Suffice it to say that in considering the record in the light most favorable to the non-movant, plaintiffs have cleared the summary judgment hurdle at this juncture on the issue of municipal policy or custom of inaction. Whether the plaintiff will ultimately succeed in proving that the alleged deficiencies of the City of Corinth constituted a policy or custom is a proper matter for the trier of fact to decide.

Liability under § 1983 may be based upon inadequate training. *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). Inadequate police training will support liability under § 1983 where such failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton,* 489 U.S. at 388, 109 S.Ct. at 1204, 103 L.Ed.2d at 426.

In *Burns v. City of Galveston,* 905 F.2d 100 (5th Cir.1990), the Fifth Circuit came close to foreclosing, altogether, a § 1983 cause of action based upon a municipal failure to train in detainee suicide cases. In commenting on the "failure to train" theory, the court observed as follows:

> Failure to train police officers in screening procedures geared toward detection of detainees with suicidal tendencies may rise to the level of a constitutional deprivation only if the right of detainees to adequate medical care includes an absolute right to psychological screening. We perceive no such right. *Gamble* involved allegations that jailers were ignoring the requests for medical care of a prisoner who manifested serious physical problems. *Partridge's* extension of *Gamble* to psychological or psychiatric conditions was based on allegations that the detainee in question had become hysterical during questioning, the police had been informed by the detainee's father that the detainee had suffered a nervous breakdown, and the detainee's clinical records from a prior confinement included a notation that he had attempted suicide then. Under those circumstances, the *Partridge* court held that a complaint alleging that the city and police department had failed to 'adequately train the jail personnel to handle arrested citizens with *known* mental problems' could arguably be the basis for finding a municipal custom of deliberate indifference to a citizen's constitutional rights. *Partridge,* 791 F.2d at 1188 (emphasis added).

It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious mental disorders. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that the

officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause. *Cf. Danese v. Asman,* 875 F.2d 1239 (6th Cir.1989), *cert. denied,* [494 U.S. 1027], 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (officers entitled to qualified immunity inasmuch as the right to adequate medical care did not create a constitutional duty to screen detainees for suicidal tendencies); *Belcher v. Oliver,* 898 F.2d 32 (4th Cir.1990) (same).

*Burns v. City of Galveston,* 905 F.2d 100, 104 (5th Cir.1990).

*Burns v. City of Galveston,* is interpreted by other courts as holding that a pre-trial detainee's right to adequate medical care does not include an absolute right to psychological screening. *Bowen v. City of Manchester,* 966 F.2d 13, 19 (1st Cir.1992); *Elliott v. Cheshire County, New Hampshire,* 750 F.Supp. 1146, 1155 (D.N.H.1990). Ironically, two post-*Burns* cases from the Fifth Circuit discuss, at length, municipal liability predicated upon inadequate training without so much as a mention or citation to *Burns. See Rhyne v. Henderson County,* 973 F.2d 386 (5th Cir.1992); *Benavides v. County of Wilson,* 955 F.2d 968 (5th Cir.1992). In any event, a close reading of *Burns* appears to reflect that a "failure to train theory" which travels solely on the coattails of inadequate medical-psychological screening is doomed.[16] *Burns,* however, affirmed the basic tenet of *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182 (5th Cir.1986). That is, inadequate training of jail personnel to handle detainees with *known* mental problems can be the basis of a municipal custom of deliberate indifference. Moreover, the court understands plaintiff's cause of action to allege more than inadequate training for psychological screening. Plaintiff also alleges inadequate training in the safe custody and confinement of intoxicated or disturbed detainees (including suicide prevention).

In considering plaintiff's failure to train theory of liability at the summary judgment stage, the court takes note that the affidavits of Dr. Kirkham and Mr. Rowan address this question in some detail. The court has considered the affidavits and accompanying exhibits (Exhibits N and O) and elects to deny Defendants' motion at this time and looks forward to hearing the trial testimony that these gentlemen might furnish.

*State Law Claim*

The plaintiff also asserts a state law claim against the defendants based upon Mississippi's Wrongful Death Statute, *Miss. Code Ann.* § 11–7–13 (Supp.1992). Applying the substantive law of the State of Mississippi, a claim for wrongful suicide death can be maintained only where it can be shown that as a result of defendant's intentional torts, decedent acted under an irresistible impulse in committing suicide. *Hamilton v. Chaffin,* 506 F.2d 904, 908 n. 7 (5th Cir.1975); *State ex rel. Richardson v. Edgeworth,* 214 So.2d 579, 586 (Miss.1968).

Irresistible impulse, as popularly understood, is defined as,

> an impulse produced by and growing out of some mental disease affecting the volition, as distinguished from the perceptive powers, so that the person afflicted, while able to understand the nature and consequence of the act charged against him, and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it.

*Christian v. Commonwealth,* 202 Va. 311, 117 S.E.2d 72, 74 (1960). Irresistible impulse is distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a mental disease of the mind. *State v. Hartley,* 90 N.M. 488, 565 P.2d 658, 661 (1977); 14 Am.Jur., *Criminal Law,* § 35, 793.

Considering all the record evidence and reasonable inferences in the light most favorable to the plaintiff, the court finds the evidence insufficient to support a claim of

16. It is important to understand the factual context of *Burns. Burns* concerned the suicide death of an intoxicated teenager wherein police officers had absolutely no notice of any mental problems or suicidal tendencies. *Burns,* 905 F.2d at 102. This is a far cry from the situation in the case at bar and from that which existed in *Partridge.*

wrongful death as a result of an irresistible impulse on the part of Tina Hare to commit suicide. Hence, defendants' motion for summary judgment as to the state law claim will be sustained.

PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Finally, the court comments briefly upon plaintiff's cross motion for summary judgment. Considering the evidence and all reasonable inferences in the light most favorable to the defendants, the court concludes that plaintiff's cross motion for summary judgment should be denied. This opinion contains a thorough discussion of the legal issues and contested items of material fact. This court trusts that the discussion will suffice in demonstrating why plaintiff's cross motion will be denied.

An appropriate order in accordance with this memorandum opinion will be entered this day.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT

Whereas the above styled case came before the undersigned on a Motion for Summary Judgment filed by the Defendants and a Cross Motion for Summary Judgment filed by the Plaintiff, the court rules as follows:

(1.) Pursuant to Federal Rule of Civil Procedure 54(b) and 56, Defendants' Motion for Summary Judgment as to the state law claim brought pursuant to *Miss.Code Ann.* § 11-7-13, is hereby GRANTED.

(2.) Defendants' Motion for Summary Judgment as to Plaintiff's claim pursuant to 42 U.S.C. § 1983, is hereby DENIED.

(3.) Plaintiff's Cross Motion for Summary Judgment is hereby DENIED.

All memoranda, depositions, affidavits, admissions, interrogatories, and exhibits considered by the court in sustaining defendants' motion for summary judgment as to the state law claim, denying as to the federal claim, and denying as to plaintiff's cross motion for summary judgment, are hereby incorporated into and made a part of the record in this cause.

IT IS SO ORDERED.